Whitaker, Judge,
delivered the opinion of the court:
The issue presented in this case is whether or not the profits derived from the sale by plaintiffs in the years of 1947 and 1949 of certain lots in the Williamson Groves and Lin- *692 coin Court subdivisions are taxable as capital gains, or taxable as ordinary income as gains derived by the taxpayers “in the ordinary course of [their] trade or business.”
Capital assets are defined by section 117 of the Internal Revenue Code of 1939 as “property held by the taxpayer (whether or not connected with his trade or business), but does not include * * * property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business. * * * ”
If plaintiffs did not hold these lots “primarily for sale to customers in the ordinary course of [their] trade or business,” they are taxable on one-half the profits realized therefrom as long-term capital gains, but, if so, they are taxable on the entire income as ordinary income. Garrett v. United States, 128 C. Cls. 100; Higgins v. Commissioner, 312 U. S. 212; Friend v. Commissioner, 198 F. 2d 285 (C. A. 10th); Rubino v. Commissioner, 186 F. 2d 304 (C. A. 9th), cert. den. 342 U. S. 814; King v. Commissioner, 189 F. 2d 122 (C. A. 5th), cert. den. 342 U. S. 829; Ehrman v. Commissioner, 120 F. 2d 607 (C. A. 9th); Williamson v. Commissioner, 201 F. 2d 564 (C. A. 4th); Trapp v. United States, 73 F. Supp. 385, 79 F. Supp. 320 (W. D. Okla.), aff’d. 177 F. 2d 1 (C. A. 10th), cert. den. 339 U. S. 913; Farley v. Commissioner, 7 T. C. 198.
No one factor, obviously, is determinative of whether or not property is held primarily for sale to customers in the ordinary course of one’s trade or business. But, among the factors regarded by the courts as important are the activities of the taxpayer, or his agents, in promoting sales, the extent of the development and improvement of the property, the purpose for which the property was acquired, and the frequency and continuity of sales. Victory Housing No. 2 v. Commissioner, 205 F. 2d 371 (C. A. 10th); Friend v. Commissioner, supra; Home Co. v. Commissioner, 212 F. 2d 637 (C. A. 10th); Mauldin v. Commissioner, 16 T. C. 698, affirmed, 195 F. 2d 714 (C. A. 10th); Galena Oaks Corp. v. Scofield, 116 F. Supp. 333 (S. D. Tex.); Shearer v. Smyth, 116 F. Supp. 230 (N. D. Calif.); Dunlap v. Oldham Lumber *693 Co., 178 F. 2d 781 (C. A. 5th); Rollingwood Corp. v. Commissioner, 190 F. 2d 263 (C. A. 9th); Trapp v. United States, supra. Where the sales are made pursuant to liquidation of property received by bequest or devise, the taxpayer ordinarily is entitled to treat the sales as the sales of capital assets.
Plaintiffs filed no exceptions to the Commissioner’s excellent report, and defendant’s exceptions are minor. We concur in the Commissioner’s findings and have adopted them as the findings of the court. These facts show, we think, that plaintiffs did not hold this property “primarily for sale to customers in the ordinary course of [their] trade or business.”
Plaintiffs are husband and wife. Mrs. Claudine W. Mc-Conkey is the daughter of Mrs. Nannie C. Williamson. Mrs. Williamson owned the Williamson Farm just north of the city of Roanoke, Virginia. On May 1, 1923 she sold about 180 acres of this farm to the Williamson Groves Corporation, retaining 27 acres for herself. The Williamson Groves Corporation paid the purchase price partly in cash and partly in notes, secured by a first mortgage on the land sold. The Corporation divided the property into two subdivisions, one for white people, and one for negro people. The white subdivision was known as Williamson Groves, and the negro subdivision as Lincoln Court.
Neither Mrs. Williamson nor any of her relatives were stockholders, directors or officers of the Williamson Groves Corporation.
Mrs. Williamson died on January 6, 1926, leaving as her heirs at law her two daughters, the plaintiff Claudine W. McConkey, and Lucy C. Lukens. Mrs. Lukens died 30 hours after her mother’s death.
The plaintiff Claudine W. McConkey and plaintiff James G. McConkey were married on December 11,1930. Each of them is now in excess of 65 years of age. Prior to their marriage plaintiff, James G. McConkey, had retired from all business activity, on account of his health. Mrs. Mc-Conkey had never been in business.
*694 By 1938 the Williamson Groves Corporation had fallen a year or two behind in its interest payments and the holders of their notes decided that it would be necessary to foreclose the mortgage. In addition to the notes owned by plaintiffs, there were outstanding $7,500 of these notes in the hands of the estate of Charles T. Lukens, Mrs. McConkey’s brother-in-law, and $12,500 in the hands of the First National Exchange Bank of Roanoke. The parties concluded that it would be to the interest of all concerned for all of the outstanding notes to be in the hands of one party, so that, if the property had to be bought in at the foreclosure sale, it could be bought in by one party instead of by several. Accordingly, the McConkeys exchanged certain securities received by Claudine W. McConkey from her mother’s estate for the notes of the Williamson Groves Corporation held by the Lukens Estate and the First National Exchange Bank. This gave the McConkeys a total of $62,000 of these notes.
At the foreclosure sale, James G. McConkey bought in the property on his own behalf and on behalf of his wife for the sum of $35,000. They thus acquired title to approximately 363 lots in the Williamson Groves subdivision, and 341 lots in the Lincoln Court subdivision.
It thus appears that the lots, the profit on the sale of which is in question, had been acquired by plaintiffs by foreclosure of the mortgage securing the notes which plaintiff Claudine W. McConkey received from the estate of her mother. For the purposes of this case, therefore, these lots are to be treated as having been received by plaintiffs from the estate of Mrs. McConkey’s mother. In Garrett v. United States, 128 C. Cls. 100, we held that the pi-ofit on the sales made by the Garretts in the process of a liquidation of the estate, of which they were devisees, was taxable as capital gain. There was a dissenting opinion in this case, but that concerned only the plaintiff who was actively engaged in handling the sales transactions. The court was unanimously of the opinion that the other devisees were entitled to treat the property sold as capital assets. The sales of the property here in question were made in the process of the liquidation of the estate of the mother of plaintiff Claudine W. McConkey.
*695 After the acquisition of this property, the McConkeys did practically nothing to dispose of the lots. From 1938, when they acquired the property, until 1949, a period of a little over 10 years, the extent of their activities toward promoting a sale of these lots was as follows:
The “for sale” sign which the Williamson Groves Corporation had erected on the Williamson Groves subdivision was repainted by Mr. McConkey in 1938.
He erected a “for sale” sign on the Lincoln Court subdivision. Both of these signs merely stated that the lots were for sale, and gave his name and telephone number.
On March 11, 12, 14, 15, 18, 19, 26, and April 2, all in 1939, and on March 10, 1940, a small advertisement appeared in the classified section of the Boanoke Times, and similar advertisements appeared in the Boanoke World-News on March 10, 11, 13, 14, 17 and 18, 1939. The total cost of all of this advertising was between $9 and $10. Plaintiffs have done no newspaper advertising since 1940.
Plaintiffs sold one of the lots in the Lincoln Court to a colored preacher. At his request, a small advertisement of the lots was carried in his church paper at a cost of between $15 and $20. No advertisement has appeared in that paper since 1945.
No improvements whatever were made on the property by plaintiffs; they opened no streets, they ran no sewers or water lines, or made any other improvements whatsoever.
Except for the “for sale” signs and the little advertising done in ,1939 and 1940, plaintiffs did nothing whatever to promote the sale of these lots. They merely sat back and let purchasers come to them.
When a real estate agent secured a prospect for the sale of one of these lots, he would go to plaintiff, Mr. McConkey, and find out the price of it, and if the price was acceptable, a deed would be executed by Mr. McConkey and his wife on a form which Mr. McConkey had had prepared by a lawyer some time back in 1938. From the time plaintiffs acquired the property in 1938 through 1949, inclusive, the plaintiffs have not maintained an office or place of business.
From 1938 through 1946, plaintiffs sold an average of between 15 and 16 lots' a year.
*696 By 1947 the town, of Roanoke had begun to expand north-wardly and the lots in these subdivisions became more in demand, so that in the year 1947 plaintiffs sold 88 lots, 19 in 1948, but around 185 or 190 in 1949. Of these, however, 131 were sold to one person, for the purpose set out in the next paragraph. The increase in these sales, however, was due in no way to the activities of plaintiffs, or their agents, but was due solely to the expansion of the city in their direction.
In 1949 a real estate agent purchased from plaintiffs 131 lots, built some houses on some of them, cleaned them up, and then offered about 100 of them at an auction sale. Plaintiffs had some lots adjacent to those to be offered for sale at auction, and the real estate agent came to Mr. McConkey and requested permission to sell these adjacent lots also. This permission was granted, but all activities in connection with the auction were carried out by the real estate agent. Plaintiffs did not participate in the auction or bear any portion of the expense incident thereto. At the auction, 11 of plaintiffs’ lots were sold, on which they paid the real estate agent the usual commission paid on private sales.
At no time from 1938 to 1949 did plaintiffs buy or sell real estate for others, and the only real estate they ever purchased for themselves were 4 lots in the Williamson Groves subdivision as a protection to their home property.
It would be difficult to conceive of a case where sales were made with less activity on the part of the seller. They merely sat in their home and sold such lots as unsolicited buyers might wish to buy.
Plaintiffs carried on no other business. They lived on the income from the property which had been received from the estate of Mrs. McConkey’s mother.
We are of the opinion that these lots were not sold by plaintiffs in the ordinary course of their trade or business and that they are entitled to treat them as the sale of capital assets.
It is stipulated that upon the basis of so treating these sales, plaintiffs have overpaid their income taxes for the year 1947 in the amount of $11,241.74, and for 1949 in the amount of $9,076.44.
*697 Judgment will be entered against the defendant in plaintiffs’ favor in the sum of $20,318.18, and interest as provided by law.
Laramoke, Judge; Madden, Judge; Littleton, Judge; and JoNes, OMef Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Commissioner Eichard H. Akers, and the briefs and argument of counsel, makes findings of fact as follows:
1. The plaintiffs, James G. McConkey and his wife, Claudine W. McConkey, reside at 1419 Williamson Road, Eoanoke, Virginia. Their home is located on a part of the land which was originally known as the Williamson Farm and is situated on the edge of the subdivision hereinafter referred to as Williamson Groves.
2. The mother of the plaintiff, Claudine W. McConkey, was Mrs. Nannie C. Williamson. Sometime prior to 1923, Mrs. Williamson acquired by inheritance from her uncle and aunt a tract of land known as the Williamson Farm which was located north of the City of Roanoke and contained approximately 200 acres.
3. On May 1,1923, Mrs. Williamson sold to the Williamson Groves Corporation 180.20 acres of the Williamson Farm. She retained approximately 27 acres on which was located the Williamson home property. The Williamson Groves Corporation paid part of the purchase price for the land in cash and gave notes for the balance of the purchase price secured by a first mortgage on the land sold. Neither Mrs. Williamson nor any of her relatives were stockholders, officers or directors of the Williamson Groves Corporation.
4. The Williamson Groves Corporation divided the land into two subdivisions — Williamson Groves which was a white subdivision, and Lincoln Court which was a negro subdivision. The two subdivisions were separated by a narrow strip of land. It divided both subdivisions into lots, laid out streets some of which were improved with gravel, put in some cement sidewalks, and ran water lines into each sub *698 division. A plat for the Lincoln Court subdivision was recorded in the land records of Eoanoke County on August 23,1923, and for the Williamson Groves subdivision on July 9,1924.
5. The Williamson Groves Corporation held the lots in the two subdivisions for sale to customers in the ordinary course of business. For about ten years these lots sold very well and during those years the corporation paid the interest due on its first mortgage notes.
6. Mrs. Nannie C. Williamson, mother of the plaintiff, Claudine W. McConkey, died January 6,1926. She left no will. She left as heirs at law two daughters: the plaintiff, Claudine W. Hanks now Claudine W. McConkey, and Lucy C. Lukens. The latter died thirty hours after her mother’s death. In the division of the assets of Mrs. Williamson’s estate, the plaintiff, Claudine W. Hanks now McConkey, received $42,300 in the first mortgage notes of the Williamson Groves Corporation which were secured by unsold lots in Lincoln Court and Williamson Groves. This was more than half of the outstanding first mortgage notes and this larger amount of the notes was allotted to her because the lawyer, who assisted in the settlement of the Williamson Estate and who had previously been Mrs. McConkey’s guardian, together with Mr. Lukens, husband of the deceased sister, wanted her to be as secure as possible by owning interest bearing securities.
7. The plaintiffs, Claudine W. McConkey and James G. McConkey, were married on December 11, 1930. They are now each sixty-five years of age. Prior to 1928, the plaintiff, James G. McConkey, worked for the Sperry and Hutchinson Company of New York. In 1928, he retired because of a serious gall bladder condition and lesion of the heart which made him, physically unable to continue working. Since 1928, except for the activities hereinafter referred to, he has not engaged in any business activity. He is not now and has not been at any time since the early twenties a member of any club, fraternal organization, or similar organization in Eoanoke or elsewhere.
8. When the plaintiffs were first married and for a time thereafter, Williamson Groves Corporation fulfilled its ob *699 ligations under its first mortgage notes. However, prior to 1938, the corporation fell behind in the payment of interest on these first mortgage notes and by 1938 was a year or two behind on its interest payments. At that time, the plaintiffs did not own all of these first mortgage notes but they felt that since the property which secured these notes would have to be foreclosed, all of the first mortgage notes should be in one ownership. The Estate of Charles T. Luk-ens (Mrs. McConkey’s brother-in-law) owned about $7,500 and the First National Exchange Bank of Eoanoke owned approximately $12,500 of these notes. Accordingly, several months prior to August 1938, the plaintiff, Claudine W. McConkey, acquired from the Lukens Estate and from the First National Exchange Bank the first mortgage notes of the Williamson Groves Corporation in exchange for certain other securities. These securities which the plaintiff, Claudine W. McConkey, exchanged for the notes thus acquired were also received in the disposition of her mother’s estate and they were of uncertain value at the time of the 1938 exchange. With the acquisition of these notes from the Lukens Estate and the First National Exchange Bank, the plaintiff, Claudine W. McConkey, owned all of the outstanding first mortgage notes of the Williamson Groves Corporation which notes were in the approximate amount of $62,000. At that time they were of uncertain value though they were secured by the lots in Lincoln Court and Williamson Groves.
9. On August 10,1938, a public sale of the lots in Lincoln Court and Williamson Groves, which secured the Williamson Groves Corporation’s notes, was held in front of the court house in Salem, Virginia. The plaintiff, James G. McConkey, made the first bid on behalf of the plaintiff, Claudine W. McConkey, in the amount of $35,000. His bid in that amount was low with relation to the amount of the first mortgage obligation because he thought if he made a low bid it would encourage others to bid. However, there were no other bids and the title to the lots in Williamson Groves and Lincoln Court was acquired by Mrs. McConkey by deed dated August 23,1938. Through this foreclosure, the plaintiffs acquired title to approximately 363 lots in the William *700 son Groves subdivision and 341 lots in the Lincoln Court subdivision.
10. Since the time the plaintiff, Claudine W. McConkey, acquired title to the lots in Lincoln Court and Williamson Groves at the public sale in 1938, she has made no improvements or alterations in the property and has made no changes in the subdivision plats. At the time of that acquisition, there was a “for sale” sign on the Williamson Groves subdivision approximately five feet wide by sixteen feet long. The plaintiff, James G. McConkey, had it repainted and put on it “Williamson Groves, Lots for Sale, J. G. McConkey” with Mr. McConkey’s telephone number. That sign remained on the property until 1948. Mr. McConkey also erected a sign on the Lincoln Court subdivision which had on it the words “Lincoln Court, Lots for Sale, J. G. McConkey” with Mr. McConkey’s telephone number. It was about four feet wide and eight to ten feet in length. That sign was on the property as late as early 1954. These signs were placed on the property not only to let it be known who owned the property but also that lots were for sale therein by the plaintiffs (owners).
11. On March 11,14,15, and 19,1939, the plaintiffs placed the following advertisement in The Roanoke Times:
Lincoln Court. Building lots for sale, small monthly payments without interest. J. G. McConkey. Dial 2-6835.
And the same advertisement in The Roanoke World-News on March 10,13, and 18,1939.
The plaintiffs also placed the following advertisement in The Roanoke World-News on March 11,14, and 17,1939:
Building lots for sale. In Williamson Groves, located on Williamson Road and extending three blocks west of the highway. Convenient terms without interest. J. G. McConkey. Dial 2-6835.
And the same advertisement in The Roanoke Times on March 12, 15, and 18, 1939.
In addition, the following advertisements appeared in The Roanoke Times:
*701 March 26, 1939_Williamson Road Lots for sale. Dial 2-6835.
April 2,1939_Williamson Road Lots for Sale. Several facing the highway, others in the first and second blocks west. Dial 2-6835.
March 10,1940_Williamson Road. Lots for sale by owner. Dial 2-6835.
The total cost to the plaintiffs of the above advertising was between $9 and $10. The plaintiffs have done no advertising in newspapers since 1940.
During the period from 1939 to 1945, the plantiffs placed various advertisements in a colored church paper. This action was taken at the request of a colored preacher who had previously bought a lot from the plaintiffs and who asked the plaintiffs to help him out by taking an advertisement in his church paper. The total cost of all the advertisements placed in that church paper by the plaintiffs was between $15 and $20. No advertisement has been placed in that church paper since 1945.
12. During the period from 1938 to 1949, inclusive, the plaintiffs have not maintained an office or a place of business. At no time have they held a real estate license. The sales of lots hereinafter referred to and matters connected therewith were carried out almost entirely by the plaintiff, James G. McConkey, who was familiar with real estate values, building activity and the demand for lots in the Roanoke area. The telephone given on the signs, referred to in finding 10, was that of the plaintiffs’ home, and inquiries both by telephone and in person were made at the plaintiffs’ home in connection with sales of these lots. As shown below, certain forms, records and maps pertaining to the transactions involved in this proceeding were kept in the plaintiffs’ home.
In order to facilitate any sales which might be made of lots in the two subdivisions, the plaintiffs had a lawyer prepare for them a form of contract for deed and a form of deed of bargain and sale. Both forms were printed. The first paragraph of the contract for deed form read as follows:
This Agreement, Made this_day of_, 19_, by and between Clatjdine W. McConkey and *702 James G. McConket, her husband, parties of the first part, hereinafter called the Grantors, and_ of_hereinafter called the Grantee.
Then followed the terms and conditions of the sale with blanks to be filled in showing the lot or lots sold, the total consideration, and how and where such consideration was to be paid. The deed form was prepared in a similar manner. These forms were used in completing the transactions which the plaintiffs concluded directly with the purchasers. The plaintiffs kept these forms in their home as well as a map of the property and a book in which the plaintiff, James G. McConkey, kept a record of the sales, but no one room or part of the house was set aside for the purpose of transacting business.
13. After the plaintiffs acquired the lots in the two subdivisions at the public sale in 1938, they found that the Williamson Groves Corporation had outstanding on its books contracts for the sale of lots to some forty-five purchasers who had been paying for the lots on the installment plan. The plaintiffs did not want these individuals to suffer because the plaintiffs had acquired the lots through the foreclosure sale and they did not wish to have any feeling against them in the community where they lived because of this action. They accordingly obtained the names of all such purchasers and offered to sell the lots which these individuals had purchased from Williamson Groves Corporation for the balance which these purchasers owed to the Williamson Groves Corporation at the time of the public sale. That offer was accepted by almost all the persons involved and the transactions were carried out on that basis. These sales occurred in 1938 and 1939.
14. From time to time since 1938 the plaintiffs have been approached by persons wishing to buy lots from them or agents, including real estate agents, representing persons wishing to buy lots. In such cases, the plaintiffs told those making such inquiries the price at which they were willing to sell the particular lot or lots involved. Substantially all the sales referred to in finding 16 were made in response to such inquiries. Information as to the ownership of the lots *703 came to the attention of these persons in large part through the two signs on the property heretofore referred to, through common knowledge in that area of the ownership by reason of the fact that the Williamson home where the plaintiffs lived was on the edge of Williamson Groves subdivision, through public records of ownership and through individuals who had previously bought lots. The newspaper advertising referred to in finding 11 was at best a minor factor in apprising persons of the availability of the lots for sale and in no event was a factor in 1947 and 1949, the years involved in this proceeding, since no newspaper advertising occurred after March 1940, and no advertising in the colored church paper after 1945. Inquiries, applications and negotiations for the purchase of lots were initiated by the prospective purchasers rather than by the plaintiffs and in response thereto the plaintiffs gave a stated price for the lot or lots in question. Where the party making the inquiry did not make a purchase, the plaintiffs did not follow up the prospective purchaser. The plaintiff, James G. McConkey, spent a relatively small part of his time in connection with these real estate transactions.
15. As will appear from finding 16, during the early years after the plaintiffs acquired the lots in Williamson Groves and Lincoln Court, a relatively small number was sold each year. However, as the years went by, the City of Roanoke grew northward. After World War II, certain portions of the Williamson Road area were rezoned from residential to commercial and the demand for lots in that area, which included the Williamson Groves and Lincoln Court subdivisions, increased. That area had a larger growth and there was a bigger demand for lots therein than in any other subdivision area near Roanoke. During the years 1947 to 1949, the plaintiffs received many inquiries from persons desiring to buy lots and a substantial number of lots were sold each year.
16. The number of lots sold by the plaintiffs in Williamson Groves and Lincoln Court and the number of transactions involved during the years 1938 to 1949, inclusive, are as follows:

*704

17. Included among the persons who contacted the plaintiffs with respect to the purchase of lots (see finding 14) were not only individuals who were interested in purchasing for their own use but also individuals, including real estate agents, who represented persons who were interested in buying a lot. Both in the case of the individuals who represented someone who was interested in buying a lot and the real estate agents who had a prospective purchaser, the plaintiffs would authorize such individuals to make the sale at a stated price. Where a real estate agent made such a sale, the plaintiffs would pay to such agent the commission usually paid to real estate agents. In the case of individuals other than real estate agents assisting in the making of a sale, the plaintiffs paid no fixed commissions but usually gave such individuals something between $10 and $25.
The plaintiffs did not have their lots listed with any real estate agents, either verbally or in writing, in the sense that a list of lots was given to a real estate agent with authority to seek out purchasers for those lots at a certain price or under certain conditions. What occurred in almost all, if not all, cases in dealing with real estate agents was that the real estate agent would contact the plaintiffs for authority to make a sale where the prospective purchaser had already been found and the plaintiffs would authorize the real estate agent to make the sale at a stated price.
18. During the period from 1989 to 1945, Johnson and Reid, colored attorneys who operated the Magic City Building & Loan Association, sold some lots for the plaintiffs. They proceeded in the manner outlined above; namely, *705 whenever they would secure a prospect for a specific lot they would ask the plaintiff, James G. McConkey, to give them a price on the lot. During the period from 1939 to 1945, Johnson and Reid sold for the plaintiffs fifteen lots in Lincoln Court in four transactions for the total amount of $4,000, and the plaintiffs paid them the usual real estate commission for such sales. Some, if not all, of these sales were on the installment basis and the plaintiffs, pursuant to a written arrangement, paid Johnson and Reid a fee for making collections on these installment sales. Mr. McConkey furnished Johnson aind Reid with his printed forms of contract for deed of the character referred to in finding 12.
19. Mr. Clarence H. Webster, owner of the real estate brokerage firm of C. H. Webster & Company, sold four lots in one transaction for the plaintiffs in August 1947 for $6,500 and received a commission of $650. That sale came about as follows:
When an individual who was interested in the purchase of these lots came to Mr. Webster in regard to their purchase, Mr. Webster went to the plaintiffs’ home and made inquiry of Mr. McConkey as to the price for the lots. Mr. Webster had had no prior contacts with the plaintiffs in regard to the sale of lots, but had learned of the plaintiffs’ ownership of the lots by checking the public records at the time he started business on Williamson Road. He had also seen the plaintiffs’ sign on the property in that area. In response to the inquiry, Mr. McConkey authorized Mr. Webster to offer the lots at a certain price. Mr. Webster informed the prospective purchaser of the price as named by Mr. McConkey plus his (Mr. Webster’s) commission and since such price was satisfactory, the prospective purchaser signed a contract for the purchase of the lots on that basis. Thereafter, Mr. Webster took the contract to Mr. McConkey at the latter’s home where Mr. McConkey signed it. The sale was carried out on the basis of that contract.
20. Fowlkes and Kef auver is a real estate firm in Roanoke, Virginia, of which Mr. C. F. Kefauver is a senior partner.
During the year 1947 that firm sold a total of sixty-two lots for the plaintiffs in five transactions for a total selling price of $22,900, for which the firm received from the plaintiffs a commission of $1,828.75. Sixty of these lots were sold *706 in four transactions to one builder, Magic City Homes, Inc.
.During the year 1948 that firm sold three lots for the plaintiffs in two transactions at a total selling price of $4,165, for which it received from the plaintiffs a commission of $265.
During the year 1949, exclusive of the .transactions referred to in finding 21, that firm sold twenty-nine lots and portions of three others for the plaintiffs in fourteen separate transactions at a total selling price of $18,500, for which they received from the plaintiffs a commission of $1,400.
These transactions with the plaintiffs were carried out for that firm by Mr. Kefauver in a manner similar to that heretofore outlined with respect to other sales; namely, when Mr. Kefauver had a prospective customer for a lot or lots which he knew the plaintiffs owned, he would go to the plaintiffs’ home and get a price from the plaintiffs at which they would be willing to sell the lot or lots. In the event that price was satisfactory to the prospective customer, the sale was made. Prior to securing such price from the plaintiffs under such circumstances, Mr. Kefauver had no authorization to make sales of lots for the plaintiffs. The plaintiffs paid the regular real estate commission on these sales.
21. In 1949 Mr. Kefauver came to the plaintiffs’ home and told the plaintiff, James G. McConkey, that he and his partner, F. H. Fralin, wanted to purchase a sizable group of lots in Lincoln Court. Mr. McConkey gave Mr. Kefauver a price on these lots, as a result of which Mr. Kefauver and Mr. Fralin purchased 131 lots from the plaintiffs in Lincoln Court. After the purchase, Kefauver and Fralin built some houses and cleaned up the lots.
Thereafter about May 1949, Kefauver and Fralin decided to offer 100 of the aforementioned lots at an auction sale. To carry out that purpose, they employed J. G. Sheets & Sons, a firm of real estate brokers and auctioneers, to conduct such an auction sale. That firm advertised the sale in the local newspapers, on the radio, and by the posting of a sign on the property. It also prepared a brochure which contained a map of the Lincoln Court subdivision, including not only the lots owned by Kefauver and Fralin but also the lots in that subdivision then and previously owned by the plaintiffs. It stated that this was to be an “absolute *707 auction”, which meant that in the event a lot was once offered by the auctioneer on the date of the sale and bidding started, it must be sold at the highest bid, but that the owners could require the auctioneer at any time to stop offering further lots in the event they were dissatisfied with the prices which were being received. The brochure was mailed out approximately ten days prior to the sale.
Several days prior to the sale Mr. Kefauver went to the plaintiffs’ home and discussed the auction sale with the plaintiff, J ames G. McConkey. Mr. McConkey had seen the newspaper advertisement but had not seen the brochure referred to above and did not see it until the day of the sale. Mr. Kefauver told Mr. McConkey that since some of the lots which were to be offered for sale were near or adjacent to lots owned by the plaintiffs, he would like permission to have the auctioneer offer some of the plaintiffs’ lots for sale. Mr. Kefauver told Mr. McConkey what type of auction was to be held; namely, an absolute auction where once a lot was offered for sale it had to be sold to the highest bidder, but assured him that he could stop the sale of any further lots any time he so desired. Mr. McConkey gave Mr. Kefauver permission, under those conditions, to have the lots included in the auction sale. The plaintiffs had no dealings with the auctioneer firm. While the brochure contained a map of the entire Lincoln Court subdivision which showed some 400 lots, it did not indicate which of those lots were being offered for sale other than to state that 100 building sites were being offered and that the owners were C. F. Kefauver and J. H. Fralin.
The auction sale was held on May 14,1949, at which time eleven of the plaintiffs’ lots were sold. The plaintiffs paid the firm of Kefauver and Fralin the usual lot commission of 10 percent on account of such sales. All of the advertising costs in connection with the sale were borne by Kefauver and Fralin.
22. At no time during the period from 1938 to 1949, inclusive, did the plaintiffs either buy or sell real estate for others. The only real estate purchased during that period was four lots which were acquired as a protection to their home property in which they lived. One of these lots was later given *708 by them to their maid’s daughter and the other three are still owned by them.
23. The sales of lots heretofore referred to were made on both the cash and installment basis. On installment sales, except in the case of sales by Johnson and Reid referred to in finding 18, the installment payments were made at a bank designated by the plaintiffs for that purpose and credited to the plaintiffs’ account at that bank. No charge was made by the bank for such service. At least in some instances, the down payment on installment sales was made at the plaintiffs’ home.
Most of the money received by the plaintiffs from the sales of lots, herein referred to, after the payment of taxes, was invested in investment property such as Government bonds and common stock. In addition to the income derived during 1947 and 1949 from these sales of lots, the plaintiffs received income from rentals, interest on notes and Government bonds, and dividends on common stock.
24. On January 12,1948, the plaintiffs filed a joint income tax return for 1947 showing an adjusted gross income of $20,426.96 and a net income of $17,910.36. In arriving at those amounts, the plaintiffs reported gains from the sale of lots in 1947 in the total amount of $27,255.61. These sales were treated as long term capital gains and one-half thereof, $13,627.81, included in computing amounts of income referred to above.
Attached to the 1947 return was a schedule showing the receipts on the sale of lots sold in 1947 as well as the installment collections in 1947 from sales of lots made prior to 1947. That schedule showed 21 sales transactions in 1947, 14 in 1946, 3 in 1945, 12 in 1944, 2 in 1943, 1 in 1940, and 2 in 1939, that is, a total of 55 sales transactions from which collections were received in the year 1947.
25. After an examination of the plaintiffs’ income tax return for 1947, a revenue agent recommended the net income of the plaintiffs for the year 1947 be increased from $17,910.36 to $37,713.06, due principally to the treatment of the gains from the sale of the lots referred to in the previous finding as ordinary income instead of capital gains. As a result of those adjustments, the revenue agent asserted a deficiency for the year 1947 in the amount of $11,277.46 *709 which the Commissioner assessed on June 12, 1953. However, prior to that time, namely, on November 6, 1950, the plaintiffs paid the deficiency of $11,277.46 plus interest thereon in the amount of $1,788.79.
26. On October 24, 1951, the plaintiffs filed a claim for refund for 1947 of $11,277.46, or such greater amount as might be legally refundable, the amount of income tax and interest paid as set out in the preceding finding. On June 24,1953, the Commissioner disallowed that claim.
27. On February 28, 1950, the plaintiffs filed their joint income tax return for 1949 showing an adjusted gross income of $34,022.81 and a net income of $27,359.71. In that return the plaintiffs reported net long term gains from the sales of capital assets in the amount of $50,721.21, of which one-half thereof, $25,360.61, was considered in arriving at the amounts of income referred to above. The sales included not only sales of lots in the Lincoln Court and Williamson Groves subdivisions (see finding 16) of the character heretofore described but also the sales of certain houses and lots, the amount of $50,721.21 being computed in the following manner:
Long Teem Loss on Stock :
200 shares Chesapeake & Ohio Railway Co. Stock:
Cost:
100 shares 12-21-36_$6,617.60
60 shares 2-4r47_ 2,619. 80
60 shares 12-19-47_ 2,169. 80
-$11,307.10
Sold 200 shares 12-19-49_ 5,739.48
Loss--- ($5, 667.62)
Recapitulation of Long Teem :
Capital Gains and Losses:
Realized on installment sales:
On 1948 sale of Lot 2, Block 2, Sec. C, Buena Vista-$241.36
On lots sold prior to 1949_ 3,686.66
On Lot 4, Sec. 4, National Invest. — sold in 1949_ 344.84
On sales of lots in 1949_ 688.62
On sale of houses and lots in 1949_ 3,448.49
Gain on sale of lots other than installment_ 37,922.66
Gain on lots and houses other than installment-10,056.41
Loss on stock_ (5,667.62)
Net long term gain. $50, 721.21
*710 28. After an examination of the plaintiffs’ income tax return for 1949, a revenue agent recommended that the plaintiffs’ net income for 1949 be increased from $27,359.71 to $46,217.24, due principally to the computation of the gain on the sale of lots in the Lincoln Court and Williamson Groves subdivisions as ordinary income instead of gain from the sale of capital assets, and that a deficiency be assessed for that year of $8,737.47. As a result of that recommendation, the plaintiffs on November 6,1950, paid the amount so recommended for the year 1949, namely, $8,737.47, plus interest thereon in the amount of $338.97.
29. On October 24, 1952, the plaintiffs filed a claim for refund of $9,076.44 for the year 1949, the amount of tax and interest paid as set out in the preceding finding. No action has been taken by the Commissioner on that claim but more than six months had elapsed since the filing of that claim when this action was commenced.
30. The parties have stipulated and the Court finds that the plaintiffs are entitled to report their income in 1947 and 1949 from the sales of lots in the Williamson Groves and Lincoln Court subdivisions as gains from the sales of capital assets, instead of as ordinary income, and the plaintiffs have overpaid their income taxes for 1947 in the amount of $11,241.74 (tax $9,703.81, plus interest $1,537.93, paid November 6, 1950), and for 1949 in the amount of $9,076.44 (tax $8,737.47, plus interest $338.97, paid November 6, 1950).
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law the plaintiffs are entitled to recover, and it is therefore adjudged and ordered that they recover of and from the United States the sum of twenty thousand three hundred eighteen dollars and eighteen cents ($20,318.18), and interest as provided by law.